The third case for argument is Marco Gonzalez v. Salem Shahin et al. Can I approach? You may approach. Just don't start yet until we get everybody settled, please. All right. I think everyone's settled. Ms. Thompson, you may proceed. Thank you, Your Honors. I'm Julia Thompson along with Jim Leventhal and Nathaniel Deakins. We are representing Marco Gonzalez here. We are here to ask that this Court find that the trial court abused its discretion on a number of issues and grant Mr. Gonzalez a new trial. I'm going to try to reserve four minutes of my time for rebuttal. You may, but you'll have to just stop on your own because the clock will continue if you go past there. Thank you, Your Honor. So what I'm planning on doing is addressing first the issue of the improper instruction and comments by the trial court, then move on to the issue of the improper admission of the Sooley and medical records. If there's time, I'll address the other two issues that are in our brief. I'm not planning on discussing the issue of jurisdiction unless the Court has questions about jurisdiction. We are requesting that this Court find that the offhand and extrajudicial comments and instructions by Judge Treanor when he discussed Plaintiff's Exhibit 78, the PDR label, were improper and a comment on Plaintiff's most critical piece of evidence that was evidence of standard of care against all of the defendants. As this Court is aware, the PDR is a publication put out in conjunction with the FDA and drug manufacturers for the safety of patients and also to provide guidance to physicians about the appropriateness of prescription of the drugs and what to look out for and when they should stop the drugs. And that's what this PDR had. This PDR specifically told Dr. Shaheen that he should not be prescribing Bactrim to Mr. Gonzalez due to his urgency and frequency of urination. The PDR then told the remaining defendants that they needed to stop the prescription of the Bactrim and be aware that Mr. Gonzalez had the signs and symptoms of Stephen Johnson syndrome. The issue of the PDR label coming in as an exhibit was subject to a pretrial motion which the judge decided under Federal Rule of Evidence 803.17 and 803.18 that it would be admitted as well as based upon the State Court in North Dakota's case of Watson and Winchester, which are cited in our brief. In the morning of the third day or second day of evidence, the judge informed us that he wanted to give the instruction which also became instruction 19 at the end of the case. He circulated the instruction. We reviewed it. We thought it was appropriate. Just he then was about to bring the jury in and said, I'm going to give a few comments to the instruction and asked if there was, said Mr. Leventhal. His comments that he told us at the time were appropriate. They were along the lines of the instructions that were given in the Reed v. Malone case. The judge was commenting a bit on the evidence, but not putting his finger on one side or the other. So when he then gave his instructions again and comments, at the beginning of his comments and instructions, there was nothing that was objectionable. And it starts at, in the trial, on the record of page 375 through 376, line 2. And then that's when the judge made improper comments on this critical piece of evidence to the plaintiff, and then doing so was telling the jury, I'm giving you this piece of information, but I'm telling you to disregard it. He said a number of times that the jurors needed to keep the ---- Well, he allowed the exhibit to go back to the jury room, right? He did. Two or three of his comments about why he's sending that one back. Yes, he did, Your Honor. So consider that. Tell me about that. So, first of all, yes, he appropriately was sending it back, but what he said and what was improper was specifically the motive for why the PDR is in existence. He ascribed the motive that not one expert had been endorsed to testify and actually never became evidence at the trial, which was that it's to prevent lawsuits from happening against the drug manufacturer. He then also said that ---- and he said that then in that comment, he then said two more things that were inappropriate and the reason for reversal, which are that they put it in there so they don't have a lawsuit as a result. It's a case that I'm sure Mr. Leventhal would love to take on behalf of somebody who is ---- Well, the second one wasn't objected to, right? Well, everything was objected to. No, counsel. I think you even say in your brief you didn't object to, I'm sure Mr. Leventhal would love to take care of somebody who's injured as a result of this. Mr. Leventhal, who was making an argument at that time, did not have the opportunity because ---- Right. Proceed. Proceed. I just want to separate the two. Go ahead. Yeah. The Court then said denied. When he went on to make additional argument, the Court said denied. The Court said to appeal him. The Court said numerous occasions that this was a common-sense comment on the instruction. Number one, he introduced evidence. Number two, it wasn't common sense. Number three, he impugned Mr. Leventhal and impugned the actual PDR and minimized and told the jury to disregard the information in the PDR, which was an admitted exhibit. It wasn't just a comment. Well, he didn't use those terms. His best one for you that you describe is we want to make sure you don't give it more weight than it deserves. That is true. And then he's told the jury to keep it in perspective. Keep it in mind. Well, that was part of what he previewed, though, wasn't it? The part about not giving it too much weight and keeping it in perspective. Well, what he says on page 372, so we're given this instruction and we trust that they'll give it an appropriate measure of weight and no more. That was the preview. Right, and that was an appropriate instruction. That would have been an appropriate comment. You're not complaining about that. No, we're complaining on You're complaining about the reference to counsel and you're complaining about the motive for creating the PDR. And also where he says on page 376, but we want to make sure that you don't give it more weight than it deserves. Well, how is that different from giving it an appropriate measure of weight and no more? Because it's emphasizing that you don't give it more weight. That's the first one. More weight than it deserves. I don't know whether that's any different than giving it an appropriate measure of weight and no more. Well, and it's also taken on the context. I mean, you can't, we are parsing it out and I do parse it out. But really what he was saying to the jury was, so keep it in perspective, is right after the comment of, I'm sure Mr. Leventhal would love to take on behalf of somebody who's injured as a result of that type of conduct. And this was an important piece of evidence that was cited by almost every witness at the trial. It was in dispute. But what Judge Schroeder did is he told the jury to disregard it. And the prejudice that occurred was the way that then the defense counsel were able to utilize the statements made by Judge Treanor when asking other witnesses about the PDR. And then more importantly, maybe not more importantly, but as important, is what happened in closing. In closing, the defense counsel then circled back to this case being about Mr. Leventhal. And Judge Treanor put Mr. Leventhal front and center with his first comment. You objected to closing. We did not object at the closing because the judge had already determined that everything he said was appropriate. In fact, it was all common sense until he got the motion for new trial. And then it was a bad joke. Once it was, and it wasn't funny. What did the lawyer say in closing that you find objectionable? In your brief, did you object to specific, in your brief in this Court, did you object to specific comments in the closing? I thought you didn't. We did not. Proceed. Sorry. What I'm explaining is the prejudice. Go ahead. The prejudice. Did you explain the prejudice in your brief this way by referring to the closing argument? I think we did. I'm just not remembering what you said that you find problematic. So go ahead if you have it at your fingertips there. Why don't you quote it to us? I'm sorry. From the brief? No, from the closing argument. Sorry. So number one was, don't let Mr. Leventhal convince you that judgment is something that can't be utilized. Not don't let the plaintiff. Then Mr. Leventhal, probably the most prejudicial part was five providers could not have missed what was apparently so obvious to Mr. Leventhal. Not the plaintiff, not the plaintiff's experts, but this was making the case about Mr. Leventhal and not about Mr. Gonzalez and Mr. Gonzalez's experts. That's the prejudice that occurred during the trial. And this was something that occurred throughout the trial's transcript in terms of how the defendants utilized the PDR and the questions that they asked. With respect to the Sioux land, and I'm going to pivot to the Sioux land records, Judge Trinidad let the Sioux land records come in when Dr. Shaheen testified that he had never reviewed the Sioux land records when he was treating Mr. Gonzalez, that he hadn't considered them. And these records had nothing to do with the standard of care. It was different care at a different time, and it was different antibiotics that were prescribed. Vaccine was prescribed every day to many, many people. But in certain circumstances, it is an extremely dangerous drug. And so letting the Sioux land records come in was another unendorsed expert that we had no ability to fully examine other than the cross-examination of Dr. Knoedler, Dr. Shaheen's expert witness. My final comment, and then I'm going to sit down unless you have more questions, is what's hard about this case for Mr. Gonzalez is not only is he no longer working, but he went in and told the doctors, I think I'm having a reaction to Bactrim. And they kept continuing it. And the first time he got any care really related to that was when he called 911 from the ICU. Okay. You said you didn't want to argue jurisdiction, or you weren't going to, but I did have a question about it. Isn't the Dill case superseded by the amendment to Rule 4? Do you know what I'm talking about? I'm not exactly sure which amendment you're talking about. I apologize, Your Honor. Well, the amendment that changed the word timely and substituted and does so within the time allowed by those rules. I don't know if you're familiar with it, but my understanding is the rule was amended to resolve this dispute about whether a forfeiture makes the motion timely and to refer specifically to the time allowed by the rules so that if the motion is not filed within the time allowed by the rules, then it's untimely. And your forfeiture argument based on Dill would no longer work. So we still get back to Hamer. I don't think Hamer is undone by what the Court's saying is the change in the rule. Hamer is the presiding case, and we're still in claim processing rules. And so I don't think the rule says that it can't be forfeited. All right. We'll look at Hamer, but I wanted to give you a chance to speak to that rule amendment. Thank you. I'd like to reserve the rest of my time. Excuse me. Let's see. We have four different counsel who plan to argue, as I understand it. My list shows Ms. Kolb going first. Is that right? Is that the plan? You may proceed. Thank you. May it please the Court. Counsel, my name is Tracy Kolb. Along with Bessie McDonald, I represent Dr. Richard Martin, Dr. Carol Gilmore, Dr. Paul Andelin, and Mercy Medical Center. I plan to address the jurisdictional argument. That will be the emphasis of my five minutes that we've tried to allocate among my colleagues also appearing here today. They will address the other issues, and I will rest on the appellee's briefing and argument as to those issues. After an 11-day trial, 24 witnesses, 15 of which were expert witnesses, a jury returned a verdict in favor of six defendants. Mr. Gonzalez now asks this Court to give him a new trial and reverse that verdict. He's not entitled to that relief, a reason for which is he did not timely file a notice of appeal or a motion for new trial following the entry of judgment on November 19 of 2021, lest this Court's jurisdiction as the scope of review is limited. What do you say to the Hamer case or however you say it? That's where I was going to turn right now, Your Honor, and I appreciate that. Proceed. I was going to address the Court's question about Dill. Okay. Do Dill first. Do Dill first. Dill, it does not – it's not dispositive and it doesn't control because Dill did not apply the 2016 Amendment to Federal Rule of Appellate Procedure 4A4. It predates that amendment, and therefore, it's not dispositive. It's an Eighth Circuit case. It was decided in 2008, and it does talk about forfeiture and waiver. But because of the 2016 Amendment, it does not apply. Hamer, too, is not dispositive for this reason. It is a United States Supreme Court case decided in 2017, but Hamer did not involve application of the 2016 Amendment to Rule 4A4. Hamer didn't even involve the issue that pertains here. Hamer involved – addressed whether there was a timely appeal. It did not address whether an untimely post-trial motion told the time to appeal. What about the plain language of the Supreme Court? A time limit prescribed – I'm quoting – A time limit prescribed only in a court-made rule is not jurisdictional. Instead, it is a mandatory claims for processing rules subject to forfeiture if not properly raised. That's true. That's correct. That's kind of black-letter law, and that's what Hamer made even more clear, was the distinction between statutory appeal deadlines, which are jurisdictional, versus mandatory claim processing, which are not and can be forfeited or waived if not preserved or objected during the lower court proceeding. However, Hamer did not even address the issue that is at issue here. In fact, it specifically reserved it when it remanded it back to the circuit court for further direction based on what it decided in that case. And it does not involve application of the 2016 Amendment to Rule 4A4, the Rule of Appellate Procedure, which was amended specifically to address the issue that is at issue here in this case. There was a split among the circuit courts concerning whether a motion that was filed after the deadline under Rules 50, 52, or 59 counted as timely under Rule 4A4 when a district court had allowed an extended filing deadline, an extension that is prohibited under the Federal Rules of Civil Procedure 6B2. Under the majority view at that time, such a motion did not toll the appeal period. The minority view held to the contrary. The majority view was adopted with the advisory committee notes explaining that an untimely motion will not qualify as a motion that restarts the appeal time under Rule 4A4, and that's regardless whether another party consents or fails to object to the motion's lateness, or the court decides the motion in spite of its untimeliness. To do so would put an appeal deadline and an appellate court's jurisdiction in the hands of parties. While it is the rule that governs, the advisory committee notes on a Federal rule are of weight in interpreting the meaning of the rule. There's a reason Rule 4A4 was amended, and the rule, along with the advisory committee notes, tell us why. The three cases cited by Mr. Gonzales in support of his opposition to this jurisdictional issue, Hammer, Dill, and then Escribano case, none of them are dispositive or controlled because none of them, they all predate 2016 amendment, and none of them addressed the Rule 4A4 as it was amended in Rule, excuse me, in 2016. Counsel, in Hammer, the court expressly reserved whether a claims processing rule would be subject to an equitable exception. Is that in play here? I don't think so, Your Honor, and here's why. Because I think the amendment to the Rule 4A4 in 2016 was intended to get rid of that type of equitable exception, a unique circumstances doctrine or what have you. And I don't think that Hammer can tell us that more specifically because, again, it didn't involve application of the amended rule in 2016. With that, I'll conclude my argument to allow my colleagues time. I do ask the Court to affirm the district court in all respects. All right. Thank you for your argument. Ms. Rommel, we'll hear from you. I'm just going to let the clock run. She ate into some of your time, so you're going to have to decide when to stop because each of the others will be shortened if you use your full amount of time. Understood. Thank you, Your Honor. May it please the Court, my name is Brianna Rommel, counsel for PA Jeffrey Adams, one of the employees in this medical malpractice action. As the Court is aware, the jury returned a unanimous verdict in favor of the defendant, specifically finding that none of the named parties, including the plaintiff, were at fault in the underlying case. In addition to the jurisdictional issue addressed by Attorney Cold and set forth in the briefing, this is significant because although Gonzalez has alleged numerous errors on appeal, he's failed to satisfy his burden in establishing that any of those alleged errors improperly and prejudicially influence the ultimate outcome at trial. And we know this to be true by looking at the special verdict form, which the Court in Cotero tells us provides the framework for this analysis. The special verdict form available in the joint appendix starting at page 131 is a general verdict form from which we have no way of knowing why it is the jury ultimately returned a verdict in favor of the defense. In fact, the parties in the Court are left to speculate why exactly it is that the jury returned the verdict that it did, and there's no way of demonstrating on this record any prejudice to Gonzalez or perhaps alternatively the jury considered the evidence properly before it and rendered its decision. For this reason alone, the District Court's order denying the motion for new trial should be affirmed. One of the alleged errors specific to P.A. Adams relates to the cross-examination of Dr. Gordon Langing, P.A. Adams' standard of care expert in this case. Gonzalez contends that the number of objections during that examination is sufficient basis to reverse on appeal. Gonzalez concedes in briefing, however, that more than half of those objections were sustained, and of course all counsel have the ability and in fact the obligation to create a record and preserve issues. Does the record show how the clock was running or not running on the time I got confused by the briefs? I think there's some open question on that. There was at the beginning of trial notations on the record that the clock would be stopped according to the District Court judge, and I specifically recall and believe it is reflected in the record. But neither party made a real record on this as to how the time was really done at the time we're talking about. Specific to Dr. Langing's examination, I don't think that the record is clear, but my recollection is that the clock I'm sorry you can't testify, but go ahead. Yes, I believe that the clock ran unless the Court indicated on the record that the clock stopped. In other words. Did the Court say that? I know you said that. Did the Court say that? The Court did not specifically articulate that during Dr. Langing's examination. But the Court said that at the beginning of the trial? Yes. Okay, proceed. Yes. The number of objections, of course, is dependent upon how evidence comes in at trial and is presented and admitted, and there's no law, rule, statute or otherwise that limits the number of objections that can be made. Are you going to address the Exhibit 17 issue as well? Yes, I'm glad you brought that up. Gonzales takes issue with cross-examination specific to Exhibit 17, which was a medication administration nursing policy at McKenzie County where PA Adams had privileges to practice at the time of the care in question. Objection was made to that line of inquiry for two reasons. The first being that the exhibit had not been previously admitted, which was incorrect. A curative instruction was provided on the record informing the jury that that exhibit had. Okay. So why don't you cut to the real reason that was given and whether it was valid. The other objection that was made was that the witness had not seen or been familiar with the exhibit itself. And so it was, in essence, a lack of foundation objection. And I think the significance of that as it relates to this appeal. I don't understand that lack of foundation. What does that mean? The exhibit was in the record. Yeah, I think it was. What do you mean by lack of foundation? They just wanted to ask him about the exhibit. I think the idea was that this particular witness wasn't familiar with the exhibit itself. You could say that. And I think the reason underlying that objection was in part that this was a nursing policy, and there's testimony on the record to that from McKenzie County nurses, and that's available at 1818 lines 9 through 12. And so the idea being that Dr. Langang was there to testify as to the standard of care for P.A. Adams, a physician assistant, and there were other experts there available to testify as to any nursing standard of care. And with that, I see I'm cutting into my colleague's time, so I would respectfully. All right. Thank you for your argument. Thank you. Mr. Paulson, we'll hear from you. We've got 4.44 left and 7 minutes of allocated time. So you and Mr. Bayless are left. Thank you, Your Honor. May it please the Court, I am Matt Paulson, and I represent McKenzie County Health System. With respect to the judicial comments this Court should affirm, the Court has broad discretion to comment on the evidence when it's necessary to aid in a clear understanding thereof, and the only real constraint on that discretion is it must not preclude a fair evaluation of the evidence. Evidence is not deemed to have had its value precluded. When we look at that issue, we need to look at the charge to the jury as a whole. So we look at the jury instruction and the comments. The jury instruction is very clear. Contrary to some of the assertions that we heard, we don't disregard the Bactrim label. It is relevant to the standard of care, but it cannot be given dispositive weight. The comments supported that notion by pointing out one potential limitation with that type of evidence, it was not created to set the standard of care, and that there are mixed motivations which are well documented in the various policy or, forgive me, various state Supreme Court cases have articulated that. But there was no evidence there written by drug companies and lawyers in that particular comment. There's no evidence in the record of that, right? I don't believe that there was actual testimony on that, but I would go back to the standard, which is that the Court can comment to aid in a clear understanding of the evidence, and these are things that are out in published decisions. You know, New Jersey, New York, Hawaii, various other courts, in framing the rule that you do not give dispositive weight to the package inserts, they have pointed to these same commonly observed mixed motives. With respect to the allegedly prejudice, oh, one other point I would make is that there were limiting instructions given, and under the Eighth Circuit case that was cited by opposing counsel, you know, essentially they found that the comments and the charge together, along with limiting instructions, are important and ameliorate against potential for prejudice. This Court did say to the jury, you are the sole deciders of the fact. You must carefully weigh the evidence, and if you find that something I said doesn't accord with how you find the facts, go with how you find it. He also noted, I do not intend to suggest to you what I want the verdict to be. With respect to the allegedly prejudicial comment, essentially it was not objected to. It was only reviewed for plain error. It was a few seconds on day three of a 12-day trial. It is not the sort of thing that would merit reversal. It would not cause a miscarriage of justice. I see my time is up. Very well. Thank you for your argument. Mr. Bayless, we'll hear from you. They cut you one minute. You'll have to take that up in the taxi on the way to the airport. I'll be even briefer than I was going to be. All right. Very well. I want to address two issues in my two minutes, and the first one is the significance of Exhibit 68, the package insert with respect to Dr. Shaheen. This issue does not affect Dr. Shaheen. If you look at the testimony of Dr. Rames, who was the physician who gave, the appellant's physician who gave testimony that discussed Dr. Shaheen's standard of care, he doesn't even address the package insert issues. The package insert issues didn't have anything to do with the initial prescription as far as the evidence was developed at trial. So what's your point? There was error there that? It doesn't affect Dr. Shaheen's entitlement to judgment. It doesn't affect his liability in any way, shape, or form because he was not somebody that was affected by that issue. The issue about. . . It would be like harmless error as to Shaheen. Correct. With respect to that package insert, that related mostly to individuals later on down the chain once the symptoms developed, not referring back to the package insert to learn information about this medication. That's the way it came up at trial. Dr. Shaheen was the initial prescriber. We raised this issue in our brief. Instead, we challenged the appellants to come forward and tell us, well, how does this affect Dr. Shaheen? Nothing in the reply brief. Instead, what we got was defendants, defendants, defendants, without that specification of why it is that this somehow affects Dr. Shaheen. The other thing is the Soonland records. The Soonland records are relevant because there were prior urology visits with similar symptoms, and whether or not they were actually known to Dr. Shaheen at the time, they relate to the standard of care, and they also establish that his diagnosis was essentially correct. With that, my time is near an end, unless the Court has any questions. How do they relate to standard of care in your view? Excuse me? How do the records relate to standard of care? Well, the standard of care is what is expected of physicians in the same general line of practice under the same or similar circumstances. It doesn't have to be the same, but it can be similar. So we've got the same patient going to a urology clinic and being prescribed antibiotic medications, and Rames says that's something that he does in his own practice, and our testifying expert says that he does in that practice. They discuss the standard of care with respect to whether or not you prescribed antibiotics in response to a prostate infection. So that's how it relates to the standard of care. All right. Thank you for your argument. Thank you. Ms. Thompson, we'll hear rebuttal. So, number one, with respect to the cases that are discussed outside the jurisdiction of the Eighth Circuit about the motives for the PDR, those are just comments on why the PDR exists. Not one of the cases cited by the defendants, and especially the Molino case that was cited by the trial court as well, and that's the New Jersey case, Molino, that wasn't evidence that came in. That's just a discussion as to why they might admit the evidence, but not that that was testimony evidence at trial. There was no testimony, no evidence of that. And that's why the improper comments by the judge and the bad joke that nobody laughed at, because it wasn't a joke. Nobody thought it was a joke. He was telling them what to do. On reflection, he says it's a bad joke, and it was objected to. This is a type of objection. This isn't the Reed v. Molino case where at the jury conference they're discussing instructions and the judge says to the lawyer, you've got choices, but this is what I'm going to do. We had the Reed case at the beginning when I cited to you page 372. The judge said these are the comments I'm going to give with the instruction. That was fine. Rule 46 and Rule 51 don't account for what do you do when the judge makes an improper comment to the jury and gives improper instructions. We did what followed Rule 51. We waited to the next opportunity to bring it to the court's attention outside the presence of the jury. That's what we did, and that's what we were supposed to do. We didn't waive any objection. This is not plain error. This is abusive discretion. Well, I don't think it's the timing question that was raised. It was what was said at the objection. Correct. Whether it covered all of the points you're raising now. You agree that we can look at that, don't you? I do, but you need to look at it in its entirety. All right. This was not just one instruction. This was not just one objection. Mr. Levenfeld tried to speak again, and the Court said denied. You can go to the appellate court. There wasn't a chance to go any further. With respect to your Honor, I'm out of time. Go ahead. Make your last point, but succinctly, please. My last point, it will be succinct, Your Honor. The last point is that Exhibit 17, the reference to the PDR by McKenzie County Hospital, was a policy for the entire hospital. And the fact is, is the reason why Mr. Leventhal or Planketh wanted to inquire of Dr. Langgang about it was because he was saying that the PDR was unnecessary. But this was a piece of evidence that he didn't have, that wasn't shared with him by the side that he was coming in to testify to. And it's part of cross-examination to challenge the witness about the information and the facts upon which they're relying. Thank you. Very well. Thank you for your argument. Thank you to all counsel. The case is submitted and the court will file a decision in due course.